UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Criminal No. 2:02-CR-91-5 |
| ) | |
| GERARD BLANCHARD, ) | |
| Defendant. ) | |

## DEFENDANT GERARD BLANCHARD'S MOTION TO DISMISS, WITHOUT PREJUDICE, FOR EGREGIOUS VIOLATION OF DUE PROCESS, VIOLATION OF INTERNATIONAL LAW, AND UNLAWFUL ATTAINMENT OF JURISDICTION OVER HIS PERSON, REQUEST FOR AN EVIDENTIARY HEARING AND AN ORDER THAT HE BE RETURNED TO CANADA

**NOW COMES**, the Defendant, Gerard Blanchard, by and through counsel, Richard Bothfeld and Matthew Anderson, and hereby moves for dismissal, without prejudice, of the above-captioned cause on the grounds of egregious violation of his rights under the Due Process clause of the Fifth Amendment to the United State Constitution, governmental violation of international law and the unlawful attainment of jurisdiction over his person. He also seeks his repatriation to Canada. Thereafter the United States may renew extradition efforts to the extent permitted by international law and, if successful, prosecute Defendant after lawfully securing his presence to stand trial. In support, Defendant Blanchard submits the following Memorandum of Law.

## MEMORANDUM OF LAW

"Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law

> scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means- to declare that the government may commit crimes in order to secure the conviction of a private criminal- would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face."

Olmstead v. U.S., 277 U.S. 438, 468, 48 S.Ct. 564, 66 A.L.R. 376, 72 L.Ed. 944 (1928) (Brandeis, J.).

## I. INTRODUCTION

Defendant is alleged to have been a supplier for a Canadian marijuana export conspiracy. See, Indictment. The present Motion focuses on his abduction in Mexico by Mexican authorities acting, upon information and belief, at the direction of U.S. Government agents and his involuntary transport therefrom to California. These actions came after the U.S. Government had unsuccessfully sought Defendant's extradition from Canada. The injustice of these activities is magnified by the fact that Defendant was convicted in Canada in connection with his alleged role in the marijuana conspiracy and had already served thirty months in prison there. In sum, the US Government has violated international and constitutional law for the purpose of trying to punish him a second time.

## II. FACTS

The following facts are either undisputed or will be established at a hearing on this Motion.

The Government's evidence against Mr. Blanchard is sparse. He is named in only two counts of the 2002 Indictment. As best as can be determined, it appears as though he is alleged

to have either supplied marijuana to the principal conspirator, Mr. Cusson, or acted as a middle man for such a supplier. Counsel has not seen any evidence that establishes that Mr. Blanchard knew or understood that marijuana provided to Mr. Cusson would enter the United States. The Canadian government refused to extradite Mr. Blanchard to face these charges.

Mr. Blanchard was criminally charged in Canada in connection with the alleged marijuana conspiracy. He pled guilty to a charge he says is known as "gangsterism" under Canadian law. He recalls that at his sentencing the prosecutor offered the opinion that it was unclear what degree of involvement he had in the conspiracy. He was sentenced to sixty months in prison and a $75,000 (C) fine, which he paid. He says that the term of imprisonment was reduced to thirty months upon his payment of the fine. He had no criminal record prior and has not been convicted of a crime since. He served his time in the Canadian federal prison in Montreal: "Monte Saint Francois". He advises that he managed the kitchen while there, was a model inmate and considered a low recidivist risk by his caseworker's calculus upon his release in 2006.

In recent years, Mr. Blanchard advises that he has worked as a lumber purchasing agent for a firm named "M3 Imports". This employment has called for him to travel to Central and South American countries to purchase quantities of native lumber and arrange for their transport to Canada. This business is what occasioned his presence in the Oaxaca region of Mexico in December of 2010 when he was detained by Mexican agents at the airport in connection with the present charges.

He advises that he was detained by Mexican agents upon arrival of his flight from Toronto. He believes that the agents were waiting for him because he was sequestered from the other passengers before he even entered customs when an agent looked at his passport. He was

told that he was being detained because "the Americans wanted him" and that arrangements had been made for him to be flown to California.

It apparently took a few days for the Mexican authorities to make arrangements for Mr. Blanchard's transport to California. During that time he was denied the ability to contact anyone, despite his requests to call the Canadian embassy. At one point, he says that a Mexican official rhetorically asked him if there was any stamp on his passport indicating he was in Mexico, knowing that he had been intercepted before entering customs, and then the Official said something to the effect: "See, you were never in Mexico". It goes without saying that he was never <u>Mirandized</u> by any Mexican authority.

After his second night of sleeping on a Mexican floor, Mr. Blanchard was flown under armed Mexican guard on a commercial flight out of Mexico City to Los Angeles on December 15, 2010. The U.S. Government contends that on the flight, in midair, he supposedly offered to bribe one of his Mexican captors to let him go. This claim borders on ludicrous, since a) it would be preposterous to attempt to bribe your way off a commercial flight in mid-air and, b) if it is alleged that American law was violated the Government must concede that the Mexican officer was acting as an agent of the US Government, which impacts other legal issues. Further, the Government would have to identify and produce the Mexican officer to testify, which seems very unlikely, and since Defendant was obviously in custody, but had not been <u>Mirandized,</u> his alleged statements are likely to be inadmissible. In any event, US Marshals were waiting for Mr. Blanchard upon his arrival in Los Angeles and they immediately arrested him.

**III.    ISSUE**

Under all of the facts and circumstances, does the manner by which the US Government attained Defendant's presence in the United State sufficiently offend our concept of due process, international law and traditional common law traditions of personal jurisdiction to warrant dismissal of the Government's Indictment, without prejudice, and the repatriation of Mr. Blanchard to Canada?

**IV.    ARGUMENT**

A.    <u>Dismissal is Required Under U.S. v. Toscanino, 500 F.2d 267, (C.A.N.Y. 1974) for Violation of Due Process</u>.

In <u>U.S. v. Toscanino</u>, 500 F.2d 267 (C.A.N.Y. 1974) our Second Circuit Court of Appeals held that unlawful kidnapping of a fugitive in a foreign country could potentially warrant dismissal of the Government's charges. Mr. Toscanino was abducted by American agents in Uruguay. <u>See, id</u> at 267. He claimed that they tortured him before bringing him to the United States to face drug charges. <u>Id</u>.

The Second Circuit began its legal analysis by acknowledging that the traditional rule, under <u>Ker v. Illinois</u>, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1888), and <u>Frisbie v. Collins</u>, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952) was that the Government's power to prosecute a defendant is not impaired by the illegality of the method by which the court acquires control over him. <u>See, Toscanino</u> at 271. Under the traditional rule, "due process was limited to the guarantee of a constitutionally fair trial, regardless of the method by which jurisdiction was obtained over the defendant. Jurisdiction gained through an indisputably illegal act might still be exercised, even though the effect could be to reward police brutality and lawlessness in some cases." <u>Id</u> at 272.

The Toscanino Court then examined the traditional rule in light of more recent Supreme Court jurisprudence which greatly expanded Constitutional Due Process protections. See, id, citing, United States v. Russell, 411 U.S. 423. 430-431, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (Due Process Clause of the Fourteenth Amendment requires that the Exclusionary Rule be applied in state prosecutions); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961); Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (Due process required suppression of pills obtained by government through forced enema). The Court noted that these cases unmistakably hold that Due Process protections extend to pre-trial conduct by law enforcement. See, id at 273. They also affirm our bedrock principle that law enforcement should not be able to obtain convictions by violating the Due Process rights of the accused.

Our Second Circuit then embraced the following clean and straightforward application of our modern due process values to governmental kidnapping of suspects: "…and when an accused is kidnapped and forcibly brought within the jurisdiction, the court's acquisition of power over his person represents the fruits of the government's exploitation of its own misconduct. Having unlawfully seized the defendant in violation of the Fourth Amendment, which guarantees 'the right of the people to be secure in their persons . . . against unreasonable . . . seizures,' the government should as a matter of fundamental fairness be obligated to return him to his status quo ante." Id at 275 (footnote omitted). The Court then exhibited an admirable amount of gumption by explicitly challenging the US Supreme Court to condemn governmental kidnapping with:

6

> Faced with a conflict between the two concepts of due process, the one being the restricted version found in Ker-Frisbie and the other the expanded and enlightened interpretation expressed in more recent decisions of the Supreme Court, we are persuaded that to the extent that the two are in conflict, the Ker-Frisbie version must yield. Accordingly we view due process as now requiring a court to divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights. This conclusion represents but an extension of the well-recognized power of federal courts in the civil context to decline to exercise jurisdiction over a defendant whose presence has been secured by force or fraud. See, In re Johnson, 167 U.S. 120, 126, 17 S.Ct. 735, 42 L.Ed. 103 (1896); Fitzgerald Construction Co. v. Fitzgerald, 137 U.S. 98, 11 S.Ct. 36, 34 L.Ed. 608 (1890).

Id.

The abduction of Mr. Blanchard does not merely represent a violation of his individual rights. It also represents an outrageous affront to the sovereignty, laws and values of our neighbor and close ally, Canada. After all, Canada punished Mr. Blanchard for this alleged conduct and refused to extradite him to the United States to face additional punishment. For the United States to nevertheless secure his abduction while he was traveling abroad on legitimate business is the sort of unilateralism that would likely spur considerable outrage if it were an American citizen being abducted in Mexico at the bequest of the Canadians.

Admittedly, counsel for Mr. Blanchard are not scholars of international law. However, it seems highly likely that Mr. Blanchard's abduction after Canada's denial of extradition violates the spirit, if not the letter, of our extradition treaties with Canada. As the Toscanino Court noted: it is "a long standing principle of international law that abductions by one state of persons located within the territory of another violate the territorial sovereignty of the second state and are redressable usually by the return of the person kidnapped". Id at 278.

7

Nor can there be any persuasive dispute that the Mexican authorities were acting as the U.S. Government's agents in the abduction and transportation of Mr. Blanchard to Los Angeles. He was stopped and held because the US Government wished it and communicated that desire to Mexico. It is clear that the Mexican authorities were communicating with US officials over the course of the two days that Mr. Blanchard spent in Mexico. This is a logical inference that can be drawn from the US Marshal's waiting for his arrival at LAX.

B.     Dismissal is Required Even Though Mr. Blanchard was not Tortured.

In U. S. ex rel. Lujan v. Gengler, 510 F.2d 62, (C.A.N.Y. 1975) the Second Circuit backtracked from its holding in Toscanino. It held that Toscanino's co-defendant, Lujan, could be tried in the United States despite the fact that he was obtained illegally from another nation's territory. The Second Circuit rested its decision upon two significant factual distinctions between the two cases. First, it emphasized that Lujan did not allege that he was tortured in the course of his abduction, as Toscanino had claimed. See, Lujan at 66. Second, the Court emphasized that no nation had made any claim to a violation of its sovereignty incident to Lujan's abduction. See, id at 67-8. Crucially, the Court left the door for this Motion wide open by explicitly stating: "[w]e do not have to decide here whether, in the absence of a claim of torture or of similar reprehensible conduct, the violation of international law alone would require dismissal of an indictment." See, id at 68. Accordingly, as Canada objected and refused to extradite Mr. Blanchard, the requisite violation of sovereignty is preserved and he is free to argue that his case falls sufficiently within Toscanino to warrant dismissal, even though he was never tortured by anyone. See, U.S. v. Reed, 639 F.2d 896 (C.A.N.Y., 1981) (Affirming Lujan's framework for analyzing Governmental extraterritorial kidnapping cases as involving an examination of whether the Government's conduct was outrageous, e.g. torture, and whether or

8

not any country claimed a violation of its sovereignty); accord, Gil v. Mazzuca, WL 389103, 5 -7 (S.D.N.Y., 2004).

    C.    Toscanino Remains Good Law in Our Circuit.

In U.S. v. Umeh, --- F.Supp.2d ----, 2011 WL 9397 (S.D.N.Y., 2011) District Judge Rakoff offered the opinion that "it is reasonably clear that Toscanino is no longer good law." Id at 3. In support of this view he cited a number of Supreme Court cases that have held that unconstitutional extraterritorial abductions do not entitle the victim to dismissal of the indictment against him or her. See, id. However, Judge Rakoff did not address the fact that the most recent and important of these cases, U.S. v. Alvarez-Machain, 504 U.S. 655, 112 S.Ct. 2188 (U.S.Ariz.,1992) (Rehnquist, C.J.) explicitly affirmed that a defendant may not be prosecuted in violation of the terms of an extradition treaty. See, id at 662, citing United States v. Rauscher, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886). Furthermore, as pointed out by Justice Stevens' sensible dissent, which was joined by Justices Blackmun and O'Connor, it simply makes no sense to suggest that allies authorize the kidnapping of their citizens within their borders by foreign agents if a prohibition of such is not contained in the nations' extradition treaty. See, Alvarez-Machain, at 673. Indeed, common sense tells us that it was *assumed* by the parties to the US-Mexican extradition treaty that they could not kidnap each other's citizens in each other's territory, hence the need for the extradition treaty in the first place. As Justice Stevens' dissent better explains:

> It is true, as the Court notes, that there is no express promise by either party to refrain from forcible abductions in the territory of the other nation. Relying on that omission, the Court, in effect, concludes that the Treaty merely creates an optional method of obtaining jurisdiction over alleged offenders, and that the parties silently reserved the right to resort to self-help whenever they deem force more expeditious than legal process. If the United States, for example, thought it more expedient to torture or simply to execute a

>   person rather than to attempt extradition, these options would be
>   equally available because they, too, were not explicitly prohibited by
>   the Treaty. That, however, is a highly improbable interpretation of a
>   consensual agreement, which on its face appears to have been
>   intended to set forth comprehensive and exclusive rules concerning
>   the subject of extradition. In my opinion, "the manifest scope and
>   object of the treaty itself," plainly imply a mutual undertaking to
>   respect the territorial integrity of the other contracting party. That
>   opinion is confirmed by a consideration of the "legal context" in
>   which the Treaty was negotiated.
>
>   U.S. v. Alvarez-Machain, 504 U.S. 655, 674-675, 112 S.Ct. 2188, 2199 -
>   2200 (U.S.Ariz.,1992) (internal footnotes and citations omitted).

Furthermore, Alvarez-Machain did not deal with Toscanino's common sense reasoning that since the Due Process clause applies to pre-trial law enforcement activities and there is no suppression remedy that will discourage extraterritorial kidnappings because the infraction does not pertain to evidence gathering, extraterritorial kidnappings can warrant the remedy of dismissal of charges. If Courts want to discourage Governmental kidnappings they need to be willing to set the victims of such kidnappings free. Finally, counsel is unaware whether or not the Canada-US extradition treaty explicitly prohibits extraterritorial kidnappings of the counterparts' citizens, but are confident that a fair reading of the entire document, coupled with common sense, commands the conclusion that the nations have not authorized such kidnappings by each other. For these reasons, the defense contends that both Toscanino and Alvarez-Machain require dismissal of these charges against Mr. Blanchard because extradition was sought under the US-Canada treaty, denied, and then the US Government grabbed Mr. Blanchard from outside its sovereign borders.

## V.     CONCLUSION

What separates civilized nations from barbarous ones in the rule of law, uniformly applied to citizens, visitors and Government a like. When the Government itself can orchestrate

illegal extraterritorial kidnappings with impunity our civilization is impaired and we are not truly free. Furthermore, we damage our international image and invite reciprocal treatment of our citizens by other nations.

**WHEREFORE**, the Defendant, Gerard Blanchard, by and through counsel, respectfully requests that the Honorable Court **GRANT** his present Motion to Dismiss, without prejudice, and **ORDER** that he be repatriated to Canada. Defendant assents to leaving open the possibility of future prosecution for these alleged offenses provided that the Government can lawfully secure his extradition in compliance with law, both international and domestic.

**DATED** at Burlington, in the County of Chittenden, and State of Vermont this 28th day of February, 2011.

> *Bothfeld & Volk, PC.*
> Attorney for the Defendant,
> Gerard Blanchard.
> By: _____
> Richard Bothfeld, Esq.
> 131 Main Street
> PO Box 465
> Burlington, VT  05402
> (802) 860-1027

**DATED** at Rutland, in the County of Rutland, and State of Vermont this 28th day of February, 2011.

> *Reis, Urso, Ewald & Anderson, PLLC.*
> Attorney for the Defendant,
> Gerard Blanchard.
> By: _____
> Matthew D. Anderson, Esq.
> 60 North Main Street
> PO Box 890
> Rutland, VT  05702
> (802) 775-2361

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>GERARD BLANCHARD | CRIMINAL NO. Criminal No. 2:02-CR-91-5 |

## CERTIFICATE OF SERVICE

I, Richard C. Bothfeld, Esq., hereby certify that on the 1st day of March, 2011, I served true and correct copies of ***DEFENDANT GERARD BLANCHARD'S MOTION TO DISMISS, WITHOUT PREJUDICE, FOR EGREGIOUS VIOLATION OF DUE PROCESS, VIOLATION OF INTERNATIONAL LAW, AND UNLAWFUL ATTAINMENT OF JURISDICTION OVER HIS PERSON, REQUEST FOR AN EVIDENTIARY HEARING AND AN ORDER THAT HE BE RETURNED TO CANADA***, by having true copies thereof mailed, first class, postage prepaid, to the parties or attorneys of record as listed below:

>Tristram Coffin, U.S. Attorney
>United State's Attorneys Office
>PO Box 570
>Burlington, VT 05402-0570

Dated at Burlington, Vermont this 1st day of March, 2011.

>BOTHFELD & VOLK, P.C.
>Attorneys for Defendant
>
>By: _____
>Richard C. Bothfeld

1